Van Voorhis, J. (dissenting).
Executing the mandate of the United States Supreme Court in WMCA v. Lomenzo (377 U. S. 633), the three-Judge District Court decreed July 27, 1964: ‘ ‘ The scheme of legislative apportionment of the State of New York is hereby declared to be unconstitutional and void as being in conflict with the XIV Amendment of the Constitution of the United States
*356 It seems to me to be too clear for argument that an “ Assembly ’ ’ consisting of 150 members was an inseparable part of the “ scheme of legislative apportionment ” which was thus struck down. This .scheme of apportionment was established under subdivision 5 of article III of the State Constitution of 1894 by dividing the whole number of citizen inhabitants of the State by the number of members of the Assembly, viz., the number 150 fixed by subdivision 2. The language of subdivision 5 of article III, in the case of the Assembly, as of subdivision 3, for the Senate, demonstrates, even if it had already not been made certain by the Constitutional Convention,* that the number of 150 was selected as a necessary factor in the constitutional formula which was devised to maintain up-State supremacy. The petitioner and the petitioners-respondents would be the last to deny that rural ascendency was uppermost in the minds of the delegates who recommended the State Constitution in 1894, and this is of the essence of what was held to violate the United States Constitution by the Supreme Court in WMCA v. Lomenzo. It is as certain as can be that an Assembly membership of 150 would not have been adopted except in conjunction with the ratio for apportionment in accordance with which the Assemblymen were distributed throughout the State. In determining how much of a statute falls in the face of unconstitutionality the rule is that “ a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect pan be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.” (Dorchy v. Kansas, 264 U. S. 286, 290, per Brandeis, J. [italics supplied]; Lynch v. United States, 292 U. S. 571, 586.) *357 The New York State rule is the same as held in the numerous New York decisions cited in McKinney’s Consolidated Laws of New York (Book 2, pt. 1, Constitutional Interpretation, § 48, pp. 42-45).
The same principle applies where a State Constitution conflicts with the United States Constitution.
There being 62 counties in the State, and one Assemblyman allocated to each, it was necessary to have enough so that (every county in the State could be represented, the number being set at 150 so that there would be enough left over (88, in fact) to save appearances but not so many as to jeopardize up-State control under a formula carefully devised to distribute them so as not to threaten dominance by the smaller counties. This formula was based on a “ ratio for apportionment ” which was to be “ The quotient obtained by dividing the whole number of inhabitants of the state, excluding aliens, by the number ,of members of assembly ” (i.e., the 150 mentioned in § 2), and ft was then provided that one member of Assembly should be apportioned to every county (including Fulton and Hamilton as one) containing less than the ratio and one-half over, two members to every other county, and the remaining members to the counties having more than two ratios.
This is the formula which the Supreme Court -struck down, and the root of the formula is the ratio of apportionment which is the quotient obtained by dividing the citizen inhabitants of the State by 150. The number 150 is, therefore, the heart of the ‘ ‘ scheme of legislative apportionment ’ ’ which the Supreme Court declared to be unconstitutional. It would be playing fast and loose with the facts to assume that the number of 150 was arrived at independently of the formula in order to fix the numerical membership of the Assembly without regard to how they were to be distributed between up-State and .down-State or among the more populous and less populous .counties. Without the apportionment formula it is clear that .the number 150 would not have been prescribed which made possible compliance with the dominant traditional policy of assigning at least one Assemblyman to each county, however small, and apportioning the rest in the areas where control was designed to be located. The 1894 Constitutional Convention has been criticized for accomplishing that result. The argument *358 carries little weight that the convention intended to set the number at 150 in order to focus control in the down-State counties and to deprive many of the rural counties of an Assemblyman, which is the thrust of the decision at Special Term, ft could only have been on such an assumption that the decision below was placed, .since only on that basis could it be held that the convention and the people would have made the size of the Assembly 150 without regard to the manner in which these Assemblymen were to be apportioned, except that the 150 were ,to be distributed by dividing the “ counties into assembly districts as nearly equal in number of inhabitants, excluding aliens, as may be”. It attributes an intention to the delegates to the 1894 Constitutional Convention and to the people which is entirely different from and, indeed, opposite to that which they manifestly entertained, to consider that this figure was selected and apportionment made apart from the “ ratio for apportionment ’ ’ which was the key to the whole thing.
The intention to render these portions of the State Constitution inseparable is, of course, to be ascertained from the Constitution and Convention of 1894, but there can be little doubt that the former membership frozen at 128 by the Constitution of 1821 was known to have had the effect of limiting representation of the more populous counties nor, in my mind, is there any doubt that the number of 150 was adopted in 1894 with the same objective (See Ruth C. Silva: Apportionment of the New York Assembly, 31 Fordham L. R. 1-72, esp. pp. 2-13, esp. p. 5).
As late as January of 1965 the plaintiffs in the Federal court, who initiated the attack on New York’s “ scheme of legislative apportionment ’ ’, conceded that the Legislature could change the size of the Assembly in order to correct the existing malapportionment. In the “Preliminary Memorandum in Support of Plaintiffs’ Motion” filed in the District Court in January, ,1965, they stated (pp. 14-15): “ During the hearing last July, plaintiffs took the position that the provision governing the size of the Legislature was inseparably intertwined with the apportionment provisions which the Supreme Court had invalidated and that the Legislature is therefore free to alter the ,size of both houses * * *. We adhere to our prior position *359 .that a change in the size of the senate and assembly is permissible.” This statement was still in the brief which they submitted to Special Term as amici in the proceedings under review.
The same rule applies in measuring the reach of the decision in WMCA v. Lomenzo (supra), regardless of whether it be a ¡Federal or State question of law. It is appropriate to observe, .however, that regardless of what deferential gestures the .Supreme Court or the three-Judge District Court may have made to the State court, the State legislative apportionment formula has been struck down as conflicting with the Federal .Constitution, and it is, therefore, a Federal question. Our State Constitution is invalid insofar as it conflicts with the Federal .Constitution. It is true, as stated by the three-Judge District Court February 1, 1965, that all must fall together if the 150-member Assembly and other provisions of article III “ are inseparably intertwined with the ‘ constitutional formulas ’ condemned by the Supreme Court,” but that cannot be a consequence of State law and is necessarily a consequence of Federal law. What the District Court evidently meant was that it may ¡be a matter for the State courts to decide in the first instance how much of article III was stricken by the Supreme Court, and that it is for the States to revise their formulae in whatever manner they decide in conformity with the Supreme Court decision, but this cannot alter the circumstance that the State Constitution is invalid to the extent that it conflicts with the Constitution of the United States. Whatever invalidity there be in it results from its conflict with the United States Constitution and, as in any other instances where a State statute or constitutional provision is claimed to conflict with the United States Constitution, it presents a Federal question and a Federal question alone whether such a conflict exists and the extent thereof. There cannot be a different law governing reapportionment depending upon whether it is done by the New York .State Legislature or, in default thereof, by the Federal courts in compliance with the command that the United States «Rail guarantee to every State a republican form of government. In either event reapportionment must be accomplished in accordance with law, which means in conformity with the Constitution of the United States and any subsisting provisions *360 of the State Constitution. The extent of the effect of the Federal Constitution, as interpreted by the Supreme Court, cannot present other than a Federal question, i The order appealed from should, in my view, be reversed.
Judges Dye, Fuld, Burke and Scileppi concur with Chief Judge Desmond ; Judge Bergan concurs in result in a separate opinion; Judge Van Voorhis dissents and votes to reverse in an opinion.
Order affirmed.

 The proponents of the new article III in the 1894 Convention affirmed that the basic purpose of increasing the size of the Assembly from 128 to 150 was to obtain a particular distribution of legislative seats between rural counties and urban centers (see, e.g., Mr. Becker, Revised Record, 1894 Constitutional Convention, Vol. 3, pp. 998, 999; Mr. Root, ibid., p. 1211). Conversely, the opponents noted unequivocally their conclusion that the size chosen for the Houses of the Legislature were part and parcel of an over-all scheme to deprive unban centers of their rightful portion of legislative power (see, e.g., Mr. Bush, Vol. 3, p. 1008; Mr. Osborn, ibid., p. 1038; Mr. Speer, ibid., p. 1091; Mr. W. Sullivan, ibid., 1102, 1103; Mr. Bowers, ibid., pp. 1134, 1137; Mr. Nicoll, Vol. 4, pp. 14, 15).